Filed 12/28/23  P. v. Quiroz CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B322756 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA475932) |
| v. | |
| JOSE DE JESUS QUIROZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ray G. Jurado, Judge.  Affirmed.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jason Tran and Kristen J. Inberg, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jose De Jesus Quiroz appeals from a judgment entered after a jury found him guilty of misdemeanor elder or dependent abuse and felony sexual battery on an elder or dependent adult, committed while he was working as a certified nursing assistant at a facility where the victim was undergoing rehabilitation after suffering a stroke. The trial court sentenced him to two years in state prison.

Quiroz contends the trial court erred in instructing the jury that sexual battery is a general intent crime. We agree the court so erred, but we disagree with Quiroz's contention that the error was prejudicial. The court properly instructed the jury on the elements of sexual battery, including the specific intent element, and informed the jurors that they could *not* find Quiroz guilty of sexual battery unless the prosecution proved each element of the offense beyond a reasonable doubt. Based on the jury instructions given, therefore, the jury was required to find Quiroz acted with the requisite specific intent before it could find him guilty of sexual battery. Any error in incorrectly stating to the jury that sexual battery is a general intent crime was harmless under any standard of harmless error review.

## BACKGROUND

### I. Charges and Pretrial Proceedings

A second amended information, filed by the California Attorney General's Office, charged Quiroz with four felony offenses: in count 1, sexual abuse of an elder or dependent adult, Rossana Y. (Pen. Code,[1] § 368, subd. (b)); in count 2, sexual abuse of an elder or dependent adult, Gloria A.; in count 3, sexual battery on an elder or dependent adult, Rossana Y. (§ 243.4,

---

[1] Undesignated statutory references are to the Penal Code.

subd. (b)); and in count 4, attempted sexual battery on an elder or dependent adult, Gloria A.  As to each count, the information alleged the following circumstances in aggravation: the offense "involved great violence, great bodily harm, threat of great bodily harm, and other acts disclosing a high degree of cruelty, viciousness, and callousness" (Cal. Rules of Court,[2] rule 4.421(a)(1)); the victim was "particularly vulnerable" (rule 4.421(a)(3)); the offense was carried out in a manner that "indicates planning, sophistication, or professionalism" (rule 4.421(a)(8)); Quiroz "took advantage of a position of trust or confidence to commit the offense" (rule 4.421(a)(11)); and Quiroz "engaged in violent conduct that indicates a serious danger to society" (rule 4.421(b)(1)).

During pretrial proceedings, pursuant to Evidence Code section 1101, subdivision (b), the trial court granted the prosecution's motion to admit evidence of prior uncharged sexual conduct involving Quiroz's former coworker, N.J.  The court found N.J. to be unavailable for trial due to illness and ruled that the prosecution could play for the jury the video recording of her preliminary hearing testimony.  The court also allowed the prosecution to play for the jury the video recordings of Rossana's and Gloria's preliminary hearing testimony, finding them to be unavailable for trial because Rossana was ill and Gloria was deceased.[3]

---

[2] Undesignated rule references are to the California Rules of Court.

[3] Quiroz does not challenge any of these rulings in this appeal.

## II.    Trial[4]

In support of the charges against Quiroz, the prosecution presented evidence and argument that Quiroz touched an intimate part of Rossana against her will for the specific purpose of sexual arousal, sexual gratification, or sexual abuse.  The defense presented evidence and argument that Quiroz engaged in no wrongful conduct, and Rossana misinterpreted his actions and intent when he cleaned her while changing her diaper.

### A.    Prosecution case

### 1.    Sexual battery of Rossana

In June 2018, Rossana, who was then in her seventies, suffered an ischemic stroke involving the frontal, temporal, and occipital regions of the brain.  For approximately two months, from July to August 2018, she was a patient at a rehabilitation center, where she was bedbound.

Rossana testified that at approximately 11:00 p.m. on August 6, 2018, she pressed the call button for assistance because she needed to use the commode.  A man she later identified in court as Quiroz,[5] a certified nursing assistant, responded, and she told him what she needed.  He lifted her out of bed and placed

---

[4] As explained below, Quiroz was not convicted of either of the counts involving Gloria, a patient undergoing rehabilitation at the same center as Rossana.  Accordingly, we do not summarize herein the evidence related to the charges involving Gloria because such evidence is not germane to Quiroz's contention in this appeal.

[5] During the course of law enforcement's investigation and during her testimony, Rossana stated that the person who assaulted her had tattoos on his arm.  Quiroz did not have a tattoo on his arm.

4

her on the commode.  While she was sitting there, he grabbed her breasts with both of his hands.  No other staff member had grabbed her like that before.  She said, "No."  He placed his hand under her chin, pushed her head back, and tried to kiss her.  She told him he smelled like garlic because she was allergic to garlic.  He said he had not eaten any garlic.  He stood upright, removed his hand from under her chin, and moved her back to the bed.  She told him she had not urinated yet, and he said she could call him back to her room at any time.

Rossana further testified that shortly thereafter, between 11:30 p.m. and 12:00 a.m., she pressed the call button again and Quiroz responded.  By then, she had urinated in her diaper.  He told her that he would change it.  While doing so, he touched her "private part down there," moving his gloved hand "in a circular motion back and forth, back and forth."  No other staff member had touched her like that before.  She repeatedly said, "No," and tried to push him away.  He asked her, "Do you feel good," and she kept saying, "No."  He placed two fingertips into her "private part down there," and he "kept pushing in and pulling out."  He repeatedly asked, "Feeling good?  Feeling good?"  She told him, "No," and used her right hand to push him away.  She tried to kick him, but she was unable to lift her leg due to her medical condition.

Quiroz walked along the side of the bed until he was standing next to Rossana's head.  He pushed her head to face him.  He unzipped his pants and pulled out his penis.  She tried to grab his necklace to stop him from touching her, but she could not reach it.  She felt "very, very frightened."  His demeanor was "very aggressive."  He wanted her to touch his penis, but she did not.  He climbed on top of her body.  He asked her where she

lived, and she responded. She asked him where he lived, and when he responded, she commented on the demographics of his neighborhood and he expressed agreement with her comments. He continued to touch her body, and she said, "No, help, no." She tried to scratch him with her hand. He became angry and used his two hands to push her shoulders into the bed. She felt pain in her left arm and shouted. Quiroz left her room.[6]

Immediately thereafter, Rossana called one of her sons, but he did not answer. Then, she called her husband, Kim Y.,[7] and told him she was "scared" and wanted him to come to the rehabilitation center. Surveillance video shows Kim arriving at the center at 1:18 a.m. on August 7, 2018. According to Kim's trial testimony, he signed into the center and rushed to Rossana's room, and she told him that a male caregiver "who was helping her with her need to go urinate" had "violated [her] by touching [her] private part down there." She "seemed very nervous" and spoke "like she was in a hurry," which was unlike her typical "calm and mild" demeanor. She wanted to call the police, but Kim told her not to make a big deal out of it and not to escalate the matter. He was concerned she would be asked to leave the center and he would not be able to find another place to care for her. He spent the night in her room. During that time, she pushed the call button and staff members responded to her room. Kim testified that only female staff members came to the room,

_____

[6] Surveillance videos show Quiroz entering Rossana's room at 11:38 p.m. on August 6, 2018, and staying for approximately six minutes, and entering her room at 12:12 a.m. on August 7, 2018, and staying for approximately 17 minutes.

[7] We do not use Kim Y.'s surname to avoid disclosing Rossana's identity.

6

but surveillance video shows Quiroz entering Rossana's room several times in the hours after 1:00 a.m. on August 7, 2018, in response to calls for assistance or for regular patient checks.

Sometime on August 7, 2018, Rossana called her friend, Chris Evans, and told her what had happened at the rehabilitation center. Evans testified at trial, stating that the call from Rossana was "disturbing," and noting that Rossana's "voice was very timid" and she spoke slowly during the call. Evans sent a text message to Rossana's son, Christopher Y., telling him that "something serious is going on at the facility" and he needed to contact Rossana immediately.

Rosanna testified that on August 7, 2018, she reported the incidents to a female nursing assistant who said she would inform the office of the rehabilitation center. The administrator of the center, Kip McMillan (who testified at trial), interviewed Rossana in the early afternoon on August 7. Quiroz was suspended from work that same day, pending the investigation.[8] McMillan contacted law enforcement, and law enforcement responded to the center. Rossana told McMillan and law enforcement about the two incidents of inappropriate touching by Quiroz described above. She stated that the second incident occurred at approximately 2:00 a.m. on August 7 (which would have been after her husband Kim arrived at the center at 1:18 a.m.), during "peri-care," the cleaning of the genital area after a bowl movement or urination. Kim recounted to a sheriff's deputy what Rossana told him about the incidents, but Kim told the deputy he believed Quiroz "was just trying to wipe" Rossana.

---

[8] Quiroz returned to work on August 29, 2018.

McMillan suggested Rossana undergo a full body assessment to check for marks, bruises, or other evidence of abuse, and Rossana refused because she "knew that there was not going to be any evidence" because of the way Quiroz had touched her while wearing gloves. Rossana expressed concern about Quiroz returning to the center, so McMillan offered her a room change so Quiroz would not know her location. She declined. He also suggested she hire a "one-on-one sitter [to] be with her 24/7," which she did for the remainder of her stay, at an out-of-pocket cost of $200 per day or approximately $10,000.

During the investigation, Rossana's son Christopher Y. (who testified at trial) told McMillan and/or law enforcement that Rossana might misinterpret or overreact to things. He recounted an incident that occurred after Rossana's stroke, when a caregiver at another facility was helping Rossana up from the toilet. While adjusting his grip on her, the caregiver grabbed her buttocks as he was setting her down. Rossana told Christopher, "He touched my butt." Christopher initially told law enforcement that Rossana's accusations against Quiroz might be a misinterpretation of what occurred. During the course of the investigation, however, he came to believe Quiroz sexually assaulted Rossana.

The prosecution called a family medicine physician, who opined that a hypothetical stroke patient, mirroring the facts of Rossana's case, "would be able to recollect a traumatic incident like a sexual assault."

### 2. Uncharged conduct involving N.J.

In 2013, while working as a certified nursing assistant at a convalescent home, N.J. reported to her supervisor an incident of sexual harassment by Quiroz, a fellow certified nursing assistant.

8

N.J. testified that one afternoon/evening, while she and Quiroz were working as partners for the first time, Quiroz started touching her hands, kissing her cheeks and lips, and feeling her breasts. When he touched her breasts, he placed a hand over each breast. She told him to stop, but he did not. He touched her in three different rooms and in front of the nurse station, ignoring her repeated requests for him to stop. Later that evening, Quiroz grabbed her hand and forced her to touch his penis while his uniform pants were down. At that point, she left the room and did not work anymore. She reported the incident to the supervising nursing assistant. N.J. identified Quiroz in court as the person who did these things to her.

The human resource coordinator who investigated N.J.'s allegations against Quiroz testified at trial. She stated that soon after the incident, N.J. wrote a statement about what happened.[9]

B.    **Defense case**

The defense called as a witness Gabriela Camacho, the special services director who worked in that position at the rehabilitation center when the charged offenses occurred and at the time of trial. She testified that during Rossana's stay at the center, Rossana had episodes of confusion and forgetfulness. After the incidents involving Quiroz, Camacho did not observe signs of emotional distress in Rossana, and Rossana told Camacho that she felt safe at the center. However, Rossana had requested a 24-hour sitter because she was afraid of being alone at the center.

---

[9] The results of this investigation were not disclosed at trial.

According to Camacho, on one occasion after the incidents, Rossana accused her 24-hour sitter of stealing her towels. Camacho verified with Kim that no theft of towels had occurred. Rossana also reported that Quiroz was visiting her room at a time during Quiroz's suspension when he was not on the premises.

The defense also called as a witness Xavior Suva, who was the director of nursing at the rehabilitation center at the time Rossana reported the incidents. He participated in the investigation, including an interview of Rossana's husband Kim. According to Suva, Kim stated during the interview that 10 minutes after he arrived at the center on August 7, 2018, Rossana pushed the call button and Quiroz responded. Kim told Quiroz that Rossana needed to use the commode. Quiroz removed her undergarment and transferred her to the commode. When Rossana indicated she was done, Quiroz cleaned her with a wipe with his gloved hands, transferred her back to the bed, and replaced her undergarment. After Quiroz left the room, Rossana told Kim, "He looks like he wants to put his fingers inside me." Kim told Suva that Quiroz returned to Rossana's room several times, and Kim did not witness any inappropriate behavior by Quiroz.[10]

At trial, Suva explained the process of peri-care for a female patient, which involves spreading the patient's legs and using wipes to clean inside the labia and around the vaginal and rectal areas multiple times. Then, the nurse dries the patient with a towel, places a clean diaper on the patient, and changes

---

[10] As set forth above, Kim testified at trial that Quiroz did not return to Rossana's room after Kim arrived at the center on August 7, 2018, but surveillance video showed otherwise.

the sheets if they are soiled. The entire process, including the changing of the sheets, can take 30 to 45 minutes. It is common for a nurse to remain in a patient's room for more than 15 minutes because peri-care must be performed thoroughly to prevent infection and irritation.

Suva further testified that according to Rossana's medical chart, she was alert and oriented during her stay at the rehabilitation center, and her communication and cognition were good. There was no indication that she was delusional or had hallucinations.

Mickaela Importado testified that on August 29, 2018, while she was working as a minimum data set nurse at the rehabilitation center, she took notes regarding an incident reported to her by Rossana's caregiver. The notes state: "Reported by resident's caregiver that resident was stating to her this morning [August 29, 2018] that last night [August 28, 2018] the CNA [certified nursing assistant] came and went inside her room and touched resident's private part, and per resident, the CNA is showing his private parts to everyone."[11]

Kip McMillan, the center's administrator, testified in the defense case that he interviewed staff members and other patients/residents of the center and none of them noticed anything unusual on the nights of August 6 or the morning of August 7, 2018 (when the charged offenses occurred).

---

[11] The nursing assistant was not identified in the notes. To the extent Rossana was recounting to her caregiver an incident that allegedly occurred on August 28, 2018—and was not referring to the August 6-7, 2018 incidents—this uncharged incident occurred during Quiroz's suspension.

The defense called a neurologist, who testified that people who suffer strokes on the right side of the brain are more prone to cognitive impairment and misperception of reality, including delusions, hallucinations, and paranoia. The neurologist opined that a hypothetical stroke patient, mirroring the facts of Rossana's case, might perceive threats that are not real, misinterpret events, and report things that did not occur. Cognitive impairment would affect the hypothetical patient's ability to remember, interpret and attribute meaning to events. The neurologist also testified, however, that it is possible that the hypothetical patient would be able to recollect and recount a sexual assault.

## C.    Verdicts and Sentence

After the close of evidence, on Quiroz's motion under section 1118.1, the trial court entered a judgment of acquittal on count 2, sexual abuse of Gloria.

The jury found Quiroz guilty of misdemeanor elder or dependent abuse of Rossana (§ 368, subd. (c)), a lesser offense to that charged in count 1. The jury also found Quiroz guilty of sexual battery on Rossana (count 3). The jury found Quiroz not guilty of attempted sexual battery on Gloria (count 4).

In a bifurcated trial on the circumstances in aggravation, the jury found true as to count 3 the allegations that Rossana was particularly vulnerable and Quiroz took advantage of a position of trust or confidence to commit the offense. The jury found not true the other circumstances in aggravation alleged in the second amended information (set forth above).

On count 3, sexual battery on Rossana, the trial court sentenced Quiroz to the low term of two years in state prison. On count 1, elder or dependent abuse of Rossana, the court imposed

12

a concurrent one-year term (365 days in county jail, to be served in any penal institution).

## DISCUSSION

### I. Relevant Jury Instructions Given and Arguments of Counsel to the Jury

Using CALCRIM No. 252 (Union of Act and Intent: General and Specific Intent Together), the trial court instructed the jury as follows:

"The crimes charged require proof of the union, or joint operation, of act and wrongful intent.

"Sexual Abuse of an Elder or Dependent Adult and Sexual Battery on an Elder or Dependent Adult require general criminal intent. For you to find a person guilty of these crimes, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for each crime.

"The following crime requires a specific intent or mental state: Attempted Sexual Battery on an Elder or Dependent Adult and Attempted Sexual Battery. For you to find a person guilty of this crime, that person must not only intentionally commit the prohibited act, but must do so with a specific intent. The act and the specific intent or mental state required is explained in the instruction for that crime."

Quiroz contends, the Attorney General concedes, and we agree the trial court erred in instructing the jury in CALCRIM No. 252 that sexual battery under section 243.4 is a general intent crime. "Sexual battery is a specific intent crime. It

13

consists of touching an intimate part of another, against the victim's will, committed for the purposes of sexual arousal, gratification or abuse." (*People v. Chavez* (2000) 84 Cal.App.4th 25, 29.) Although Quiroz did not object below, the claim is not forfeited because his contention is that the instruction relieved the prosecution of its burden to prove an element of the offense— the specific intent element—beyond a reasonable doubt, a contention we may consider for the first time on appeal. (See *People v. Nelson* (2016) 1 Cal.5th 513, 543 [the "claim . . . is that the instruction misstated the elements of the crime, an assertion that may be considered on appeal despite the absence of an objection below"], citing § 1259.)

The " ' "characterization of a crime as one of specific intent [or general intent] has little meaningful significance in instructing a jury. The critical issue is the accurate description of the state of mind required for the particular crime." ' " (*People v. Rathert* (2000) 24 Cal.4th 200, 205.)

Using CALCRIM No. 936, the trial court instructed the jury as follows on the requisite elements of the sexual battery offense:

"The defendant is charged in Count Three with Sexual Battery on an Institutionalized Person, in violation of Penal Code section[] 243.4(b).

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. While Rossana Y. was institutionalized for medical treatment and was seriously disabled or medically incapacitated, the defendant touched an intimate part of Rossana Y.;

"2. The touching was against Rossana Y.'s will;

"AND

14

"3.  The touching was done for the specific purpose of sexual arousal, sexual gratification, or sexual abuse.

"An intimate part is a female's breast or the anus, groin, sexual organ or buttocks of anyone.

"Contact must have been made with Rossana Y.'s bare skin. This means that:

"1.  The defendant must have touched the bare skin of Rossana Y.'s intimate part;

"OR

"2.  Rossana Y.'s bare skin must have touched the defendant's intimate part either directly or through his clothing.

"Someone is institutionalized if he or she is a patient in a hospital, medical treatment facility, nursing home, acute care facility, or mental hospital.

"Someone is seriously disabled if he or she has severe physical or sensory disabilities.

"An act is done against the person's will if that person does not consent to the act.  In order to consent, a person must act freely and voluntarily and know the nature of the act."

The trial court instructed the jury that the prosecution was required to prove each element of an offense beyond a reasonable doubt before the jury could find Quiroz guilty of that offense. (See CALCRIM No. 220 ["A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt"].)  The court emphasized this point during the jury's deliberations, in response to a question from the jury regarding a count not at issue in this appeal (count 1), informing the jury in pertinent part:  "The jury

15

instructions set forth the elements or parts of each charge. In order to find the defendant guilty, the People must prove each element (or part) of a charge beyond a reasonable doubt. If the People do not, the defendant is entitled to an acquittal."

During argument, the prosecutor told the jury it was the prosecution's burden to prove each element of each crime beyond a reasonable doubt. The prosecutor reviewed with the jury the requisite elements of sexual battery, including that when Quiroz touched an intimate part of Rossana, "he did this for sexual gratification, or sexual arousal, or sexual abuse."

Quiroz contends the trial court's error was prejudicial, notwithstanding the prosecutor's arguments and the trial court's instructions to the jurors that they could *not* find Quiroz guilty of sexual battery unless the prosecution proved all elements of the offense beyond a reasonable doubt, including the specific intent element. For the reasons explained below, we disagree with Quiroz's contention of prejudicial error and agree with the Attorney General that the error was harmless under any standard.

## II.  Relevant Case Law Addressing Harmless Error Standard

Several appellate courts have concluded that the type of instructional error at issue here within CALCRIM No. 252—instructing that a specific intent sex offense is a general intent offense—is harmless where a later-given instruction correctly expressed the elements of the offense, including the specific intent element.

In *People v. ZarateCastillo* (2016) 244 Cal.App.4th 1161, 1165-1169 (*ZarateCastillo*), the Court of Appeal concluded the trial court's error in instructing the jury (with an instruction

16

materially identical to CALCRIM No. 252 given here) that sexual penetration of a child 10 years old or younger and forcible sexual penetration were general intent crimes was "harmless beyond a reasonable doubt" (presumably referencing, without citing, the harmless error standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)). The trial court in *ZarateCastillo* correctly instructed the jury on the elements of the offenses, including that the sexual penetration was "for the purpose of sexual abuse, arousal or gratification." (*ZarateCastillo*, at p. 1167.) In explaining the reasons for its conclusion of harmless error, the appellate court stated:

"[D]espite erroneously describing those [sexual penetration] crimes as general intent crimes, the trial court went on to instruct the jury that to be guilty of each of those crimes, defendant must have committed the act of penetration for the purpose of sexual abuse, arousal, or gratification. Thus, the trial court actually instructed the jury on the specific intent required for those crimes, despite failing to classify the crimes as specific intent crimes earlier in its instructions. Moreover, there was nothing in the general intent/specific intent portion of the trial court's instructions that suggested to the jurors that they were *not* to follow the later portions of the instructions telling them the specific intent–referred to in the instructions as 'purpose'–that was required to find sexual penetration. At most, the omission of these offenses from the list of specific intent crimes *implied* to the jury that those crimes did not require any additional, specific intent and/or mental state, but the later instructions specific to those crimes expressly described the 'purpose' of the act of penetration required to commit the crimes, and there is simply no reason to believe that the jury would have disregarded the

17

explicit direction of the later instructions because of, at best, a mere implication arising from the earlier instructions.  Nor is there any basis for believing that the jury could have, under any circumstances, rationally found that defendant penetrated the victim's vagina for any purpose *other* than sexual abuse, arousal, or gratification.  Under these circumstances, the trial court's instructional error was harmless beyond a reasonable doubt." (*ZarateCastillo*, *supra*, 244 Cal.App.4th at pp. 1168-1169.)

In *People v. Ngo* (2014) 225 Cal.App.4th 126, 146, 161-162 (*Ngo*), the trial court erroneously instructed the jury that sexual penetration of a child under 10 is a general intent crime, using CALCRIM No. 250 (Union of Act and Intent: General Intent), which included the same language at issue here in CALCRIM No. 252 regarding "wrongful intent" (as quoted above).  The trial court also gave the jury an instruction "which defines sexual penetration as doing so 'for the purpose of sexual arousal, gratification, or abuse,' thereby setting forth the required specific intent."  (*Ngo*, at p. 162.)  "Thus, the trial court ultimately instructed the jury that it must find defendant committed the sexual penetration for the required purposes."  (*Ibid*.)

The Court of Appeal in *Ngo* did not decide which standard of harmless error review applied to the error—the *Chapman* harmless beyond a reasonable doubt standard; or the *Boyde v. California* (1990) 494 U.S. 370, 380 standard, "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution; or the *People v. Watson* (1956) 46 Cal.2d 818, 836 standard, a reasonable probability of a more favorable result in the absence of the error.  (*Ngo*, *supra*, 225 Cal.App.4th at pp. 162-163.)  The appellate court concluded that under any standard the error was harmless

because "the jury must have found beyond a reasonable doubt that [the defendant] at least harbored the intent to commit the actus reus of penetrating the victim," and the "evidence supports no plausible explanation for why the defendant would have intentionally penetrated the victim unless he did so for purposes of sexual arousal, gratification, or abuse." (*Id.* at p. 163.)

Finally, in *People v. Saavedra* (2018) 24 Cal.App.5th 605, 612-614, (*Saavedra*), using CALCRIM No. 252, the trial court erroneously instructed the jury that sexual penetration of a child 10 years of age or younger is a general intent crime. The court also gave the jury an instruction (CALCRIM No. 1128) that "correctly defined sexual penetration and informed jurors of the requisite purpose"—penetration "for the purpose of sexual abuse, arousal or gratification." (*Saavedra*, at pp. 614, 615.) The Court of Appeal did not decide which standard of harmless error review applied to the error because the court concluded "the error was harmless even under *Chapman*'s more stringent standard." (*Id.* at p. 615.) The appellate court explained:

"CALCRIM No. 1128 correctly set out the elements—including the intent—required for the jury to convict defendant of sexual penetration of a child 10 years of age or younger, as charged in count 11. The language of the instruction covered both the requisite intent per se and the requirement of a concurrence of act and specific intent. The record on appeal—which we have carefully reviewed—contains no evidence that could rationally lead to a finding the act of penetration charged in count 11 was committed for a purpose other than sexual arousal, gratification, or abuse. Moreover, defendant did not contest the element, but rather denied any culpability. Since no rational jury could have found the specific intent element unproven, the error

19

was harmless beyond a reasonable doubt." (*Saavedra*, *supra*, 24 Cal.App.5th at pp. 615-616, fn. omitted.)

### III.   Harmless Error Analysis in This Case

As explained above, we agree with Quiroz, as does the Attorney General, that the trial court erred in classifying sexual battery as a general intent crime in the version of CALCRIM No. 252 given to the jury. But we disagree with Quiroz's framing of the scope of the error and its effect. We conclude the error was harmless under any standard of harmless error review, and we need not decide which standard applies here.

Quiroz contends the trial court's instructional error violated his right to due process under the Fourteenth Amendment of the United States Constitution because it relieved the prosecution of its burden to prove an element of the offense— the specific intent element—beyond a reasonable doubt. Not so. Nothing in the trial court's instructions or the prosecutor's arguments indicated the jury could find Quiroz guilty of sexual battery without first finding, among other things, that he touched Rossana "for the specific purpose of sexual arousal, sexual gratification, or sexual abuse." (See CALCRIM No. 936; see also *ZarateCastillo*, *supra*, 244 Cal.App.4th at p. 1168 ["there was nothing in the general intent/specific intent portion of the trial court's instructions that suggested to the jurors that they were *not* to follow the later portions of the instructions telling them the specific intent–referred to in the instructions as 'purpose'–that was required to find sexual penetration"].) Rather, the trial court and the prosecutor both made clear to the jury that this "specific purpose" (i.e., specific intent) of the touching was a necessary element of the offense that the prosecution was required to prove beyond a reasonable doubt. The trial court emphasized this point

20

in answering a jury question by stating: "The jury instructions set forth the elements or parts of each charge. In order to find the defendant guilty, the People must prove each element (or part) of a charge beyond a reasonable doubt. If the People do not, the defendant is entitled to an acquittal." Thus, the classification error of the offense in CALCRIM No. 252 did not allow the jury to ignore any of the requisite elements of the offense set forth in CALCRIM No. 936, including the specific intent element, and the error was harmless beyond a reasonable doubt.

Even assuming the jury instructions, on their own, were ambiguous as to the specific intent required for sexual battery—an assumption we reject—we would still conclude the error was harmless beyond a reasonable doubt based on the evidence and arguments presented to the jury.

In arguing the error was prejudicial under the *Chapman* standard, Quiroz asserts that *ZarateCastillo, Ngo, and Saavedra* are distinguishable because, here, unlike in those cases, an "innocent explanation[] of [his] conduct" was offered at trial—that he touched Rossana *not* for the purpose of sexual arousal, sexual gratification, or sexual abuse, but to clean her while changing her diaper (peri-care)—and the evidence indicated Rossana "was an unreliable historian" who "misinterpreted [his] normal caregiving activities." He further maintains, "a jury required to find specific intent might have found the evidence of it lacking and acquitted appellant of sexual battery depending on which aspect of R[ossana]'s problematic testimony it believed or rejected. On the other hand, it cannot be concluded beyond a reasonable doubt that a jury ignoring the intent requirement would not have convicted on identical factual findings."

21

Considering "the entire charge" given to the jury, as we must (*Saavedra*, *supra*, 24 Cal.App.5th at p. 614), it is inconceivable the jurors would have believed they could find Quiroz guilty of sexual battery if they believed he was touching Rossana for purposes of performing peri-care. Based on the evidence and the arguments presented to the jury, either Quiroz was discharging his duties and was guilty of no crime or he touched Rossana for the purpose of sexual arousal, sexual gratification, or sexual abuse. There was no scenario presented to the jury under which Quiroz acted with the "wrongful intent" required for a general intent crime (see CALCRIM No. 252) but with something less than the specific intent required for sexual battery. The error was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

WEINGART, J.

22